333 F.2d 244
 William C. RAINER, Joseph G. Germak, James P. Hamilton, Arthur W. Sloan, William D. Stewart and Karl A. Schellenberg, Appellants,
v.
Harold W. UNGER and Donald H. Zipper, Appellees.
 Patent Appeal No. 7102.
 United States Court of Customs and Patent Appeals.
 June 25, 1964.
 
 Cushman, Darby & Cushman, Alvin Guttag, Washington, D. C., for appellants.
 Fred S. Lockwood, Chicago, Ill., for appellees.
 Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.
 WORLEY, Chief Judge.
 
 
 1
 This appeal is from a decision of the Board of Patent Interferences holding that Rainer et al. cannot make the two counts of the interference.
 
 
 2
 The invention resides in the incorporation of silicone in a gasket-forming composition of vinyl chloride resin before curing. The counts read:
 
 
 3
 "1. A gasket forming composition comprising a vinyl chloride base resin and quantities of lecithin and silicone fluid, the latter ingredients being present in sufficient amounts so as to be present on the surface of a gasket formed from said composition and provide lubrication thereto.
 
 
 4
 "2. A gasket forming composition comprising a vinyl chloride base resin and a quantity of silicone fluid, the latter ingredient being present in a sufficient amount so as to be present on the surface of a gasket formed from said composition and provide lubrication thereto."
 
 
 5
 The gasket provides for a controlled frictional seal between a closure cap of the screw-on type, lug or screw securement, and a container such as a glass jar or bottle. The purpose of incorporating silicone in the gasket is to provide adequate sealing while preventing seizure of the cap to the container after it is rotated into sealing position. The silicone remains after the gasket-forming composition is cured and provides a lubricating coating or film on the sealing surface so that sticking of the gasket to the container is avoided.
 
 
 6
 The interference arose when Rainer copied claims 1 and 5 from the Unger patent. Although the Unger application matured to a patent first, Rainer was the first to file. Accordingly, Unger, as the junior party and having failed in his preliminary statement to allege any date prior to Rainer's filing date, was ordered to show cause why judgment should not be entered against him. In response Unger moved to dissolve the interference on the ground that Rainer is not entitled to make either of the counts on the basis of the disclosure of his patent application. That motion was denied by the Primary Examiner who said:
 
 
 7
 "It is urged in support of the motion that Rainer et al cannot make the counts that the common invention in issue was not originally disclosed by them. But a sufficient answer to this argument appears to be afforded by referring particularly to the specification page 39 lines 27 and 28 and page 40, lines 1 to 15 and page 25, lines 3 to 6 and 26 and claims 1, 9 and 66 of the application of Rainer et al. If Counts 1 and 2 in issue are broader than the `plastisols' which form the basis of so large a part of the discussion in the specification of the party Unger et al, it is no less true that the `plastisols' of claims 1, 9 and 66 `read on' said Counts 1 and 2, in spite of the fact that the filler member of said claim 66 is `inorganic'."
 
 
 8
 It is held that Rainer et al. can make the counts.
 
 
 9
 Unger then requested a final hearing on the matters raised by his Motion to Dissolve.
 
 
 10
 On August 29, 1962, the Board of Patent Interferences reversed the examiner, stating:
 
 
 11
 "In deciding whether the Primary Examiner reached the correct conclusion * * *, we must consider the applicable law, which requires an applicant who copies a claim from a patent to show that he is entitled to make the claim; which resolves doubts against him; and which requires that the disclosure should be clearer than to suggest that one skilled in the art might formulate the composition in a particular manner. * * *"
 
 
 12
 The board proceeded to consider the subject matter of Rainer's application, including those parts of his specification referred to by the examiner, and concluded:
 
 
 13
 "* * * We find no disclosure in the Rainer application of a composition comprising silicone fluid, either in the amount specified or any other amount, or in conjunction with lecithin or separately."
 
 
 14
 Rainer asserts that the board erred in its interpretation of his disclosure. Those parts of his application which, Rainer contends, disclose incorporating silicone into the gasket-forming composition, read:
 
 
 15
 "To prevent sticking to the mold, conventional release agents, such as Dow Cornings' Silicone release fluid (a polymethylsiloxane) can be employed. Alternatively, stearic acid can be incorporated into the plastisols at concentrations of 2.5% to 5%, to prevent sticking of plastisol to the hot mold without affecting adhesion of the foam to the Unichrome-coated shells adversely. Butyl stearate was similarly effective as a mold release agent and, like stearic acid, is nontoxic, but stearic acid is preferred in its overall characteristics. For example, butyl stearate served well as a mold release agent for plastisols pressured at 250 psi. carbon dioxide, but was inferior to stearic acid at 500 psi. Butyl stearate was less satisfactory as a replacement for the primary plasticizer in the range of 5 to 20%, as liners employing it, in some instances, leaked during the cycling test.
 
 
 16
 * * * * * *
 
 
 17
 "Rainer et al. claim 9 written in independent form:
 
 
 18
 "A container closure comprising a shell having a cushion liner comprising a foamed vinyl chloride polymer plastisol including a mold lubricant in the liner."
 
 
 19
 Rainer's position is, essentially that the words "alternatively, stearic acid can be incorporated into the plastisols * *" indicates that "Dow Cornings' Silicone release fluid" was to be similarly employed.
 
 
 20
 On the other hand, Unger refers to Dow Corning literature showing their silicone release fluid being applied to the surface of molds as a "dressing on the mold." Unger contends that the word "alternatively" indicates that the stearic acid is to be used differently than the Dow Corning Silicone release fluid, which, he maintains, is intended to be used according to the pertinent Dow Corning literature.
 
 
 21
 To counteract whatever probative value the Dow Corning literature may have, Rainer cites a patent to Anspon and a textbook to show that it was known prior to the filing date of Rainer et al. to add a silicone directly to a plastic composition. The textbook referred to by Rainer states:
 
 
 22
 "* * * But their poor solubility or compatibility in most resins (one reason why they are good mold-release agents) means that they are likely to bleed. Some means of incorporating them usefully into resins may yet be developed but so far their application in this field is limited. * * *"
 
 
 23
 Rainer also refers to his original claim 9, set forth above in independent form, as further support for the incorporation of silicone in the resin.
 
 
 24
 With respect to that claim the board stated:
 
 
 25
 "Rainer's claim 9 covers the foamed vinyl chloride polymer plastisol of his claim 1 including any mold lubricant in the liner. Presumably, it is based on disclosure such as that contained in lines 2-13 of page 40 of the specification, which teach the use of stearic acid and butyl stearate in this manner. Claim 9 covers such use of stearic acid, butyl stearate and any other mold lubricant which might be incorporated in the composition by later invention or development. The fact that it is broad enough to include this manner of use of silicone fluid is in no way tantamount to a teaching or suggestion that silicone fluid be so used (In re Mraz, 36 App.D.C. 435, 1911 C.D. 316; In re Collins, 75 F.2d 1000, 22 CCPA 1053, 1935 C.D. 417; Minnesota Mining and Mfg. Co. v. Carborundum Co., 155 F.2d 746, 69 USPQ 293)."
 
 
 26
 Our view of the applicable law leaves no room for doubt that we must affirm the board. As this court recently stated in Jepson v. Coleman, 314 F.2d 533, 50 CCPA 1051, 136 USPQ 647,
 
 
 27
 "When one copies claims from a patent for the purpose of instituting interference proceedings, in order to be successful, that person's application must clearly support those counts. See Brand v. Thomas, 96 F.2d 301, 25 CCPA 1053 [37 USPQ 505]; Crome v. Morrogh, 239 F.2d 390, 44 CCPA 704 [112 USPQ 49]. There must be no doubt that an applicant discloses each and every limitation of the claims and all doubts must be resolved against the copier. See [Louis H.] Segall v. [Marion W.] Sims et al., 276 F.2d 661, 47 CCPA 886 [125 USPQ 394]. * *"
 
 
 28
 All that Rainer need do here to establish that he is the first inventor of the subject matter of claims 1 and 5 of Unger's patent is to show that his application has support for those claims. That support must be clear and unambiguous.
 
 
 29
 As we view the instant facts, there is substantial doubt whether the Rainer application does indeed contemplate the incorporation of silicone into the resin. None of the examples of the specification disclose incorporating silicone nor do they even mention silicone. The literature cited by both parties is of little help since it establishes that while silicone release agents have been incorporated in the mold, they are generally applied to the surface of the mold instead.
 
 
 30
 Rainer, as one who has copied claims from a patent, is subject to the rule that "all doubts must be resolved against the copier." Jepson v. Coleman, supra. As stated in Jepson, "* * * It is not a question of whether one skilled in the art might be able to construct the patentee's device from the teachings of the disclosure of the application. Rather, it is a question whether the application necessarily discloses that particular device. See Crome v. Murrogh, supra."
 
 
 31
 Since we cannot find that Rainer's application clearly discloses the incorporation of silicone release agents into the gasket composition, we are obliged to affirm.
 
 
 32
 Affirmed.