38 C.C.P.A. (Patents)
## Application of PORTER et al.
### Patent Appeal No. 5701.

United States Court of Customs and Patent Appeals.

Argued May 8, 1950.

Decided June 30, 1950.

Rehearing Denied Sept. 29, 1950.

———◆———

Christy, Parmelee & Strickland, Pittsburgh, Pa. (Wm. H. Parmelee, Pittsburgh, Pa., and Lee L. Townshend, Washington, D. C., of counsel), for appellants.

E. L. Reynolds, Washington, D. C. (Clarence W. Moore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office, one member dissenting, affirming the rejection by the Primary Examiner, hereinafter usually referred to as the examiner, of two method claims, numbered respectively 19 and 20, embraced in appellants' application for patent for method of shaping laminated sheet material, on the ground that those claims are broader than the disclosures made in the application as filed.

Seven claims, numbered 7, 8, 9, 15, 16, 17, and 18, to which references are hereinafter made, stand allowed, six by the examiner and one (No. 17) by the board.

The appealed claims read as follows:

"19. The method of shaping laminated sheet material composed of layers of textile material bonded with a completely reacted thermosetting type of resin, which comprises immersing the material in a liquid bath of high boiling point liquid maintained in an open vessel at a temperature of at least 350°F. and below the boiling point of the liquid until the laminated material softens, and then forming the said material to desired shape before it has again set.

"20. The method of shaping laminated flat sheet material having textile sheets bonded with a completely reacted thermosetting type resin, which comprises immersing the laminated sheet material in a bath of high boiling point liquid chemically inert with respect to the laminated sheet material, and which is maintained in an open vessel at a temperature of at least 350°F. and below its boiling point, removing the sheet from the bath as soon as it has softened, and shaping it while still hot."

No prior art was cited, the rejection being based solely upon the view that the claims, because of their breadth, are not supported by the disclosures of the application, and, in view of this ground of rejection, it has been necessary to study the disclosures with much care.

The specification states: "This invention relates to the shaping of laminated sheet material comprised of cloth and a thermosetting resin, and is for a method of bending such material after the resin has been reacted."

It is recited that the material of the class to which the invention pertains is typified by material extensively sold under the trade name "Micarta," which is formed by impregnating cotton duck or similar fabric with a potentially reactive resin such as phenolic or crysylic condensation resin; that layers of the impregnated cloth are superimposed and subjected to heat and

pressure in a press, thus producing a flat sheet material which is hard and tough; that thermosetting resins (unlike thermoplastic resins) do not soften under the usual processes of heating; that "there are many instances where it is desirable to shape resin bonded sheets in a 'post-shaping' operation i. e. after the resin has become thermosetting"; that this has heretofore been regarded as impossible except perhaps for slight deformation; and that appellants "have successfully been able to permanently shape commercial sheets of the 'Micarta' or like type using a duck or other fabric as the base material, enabling it to be bent or molded to a substantial degree of deformation," by a method defined in the specification, along with a statement of results, the parts of which here pertinent read:

"* * * by immersing the resinous bonded laminated sheet material in a liquid bath at a temperature above 350°F., particularly if such bath contains a substantial amount of sulphur, that it will be softened to the point where it can be bent and worked and, upon cooling, will hold its form and will not spring back to its original flat shape. As one example of a method of carrying out my invention, mineral oil, such as a lubricating oil having a viscosity of 20 S.A.E. is mixed with powdered sulphur and the mixture is heated to about 375°F. About ten per cent of sulphur will go into solution in the oil. Any excess will remain in the bottom of the bath in a melted state. A standard 'Micarta' type of sheet is immersed in this bath for an appropriate period of twenty to thirty seconds, depending upon the thickness of the laminated material. Upon being withdrawn from the bath, the laminated sheet material may be placed between wooden dies and subjected to moderate pressure. The sheet material will conform to the shape of the dies under moderate pressure. Upon cooling, the sheet will have a permanent set and will not spring back to its original flattened condition. It is possible to stretch the material to a considerable extent in this forming operation and relatively sharp bends can be made without the resin or cloth cracking.

* * * * * *

"When the sheet has been pressed in the manner above described, it may be cleaned to remove the oil. There is apparently no alteration in the resin and it appears to be as hard and as impermeable as it was originally.

"Instead of using oil with sulphur, it is possible, although less satisfactory, to use oil to which no sulphur has been added, * * *.

"In lieu of using oil, satisfactory results may be obtained by using molten sulphur at a temperature of around 375°F., or a molten sulphur having sand incorporated therein may be used. The sand acts as an inert filler and, aside from this, appears to have no function in the method. * * * The sulphur appears to have a property of affecting the resinous coating at the temperature above indicated to render the sheet thermoplastic, but this is purely a temporary and transient condition of the plastic and it does not become permanently thermoplastic. Heated vegetable oils, as for example castor oil, might also be employed, except for the solidification which castor oil and similar vegetable oils undergoes upon prolonged heating.

"The same resin bonded laminated sheet material, if subjected to a much higher degree of dry heat, is not softened. For example, it may be placed in a dry oven and heated to temperatures much above 400° without softening and does not soften even when the flame of a torch is directed against it. The phenomenon is therefore not due merely to heat, but requires the presence of heated liquid having a quality of temporarily affecting the resin and most especially a heated liquid containing sulphur.

"While I have illustrated and described certain specific embodiments of my invention, it will be understood that this is merely by way of illustration and that other liquids than those specifically named may be employed, among which are glycerin and some of the more complex alcohols."

From the foregoing it may be seen that the specification teaches the use of a liquid bath containing ingredients as follows:

· ·(1) *Mineral* oil, such as a lubricating oil having· a. described viscosity, mixed with powdered sulphur.

(2) Oil to which no sulphur has been added.

(It is assumed that in this respect it was intended by appellants to teach the use of *mineral* oil only, because there is no teaching that any vegetable oil is so usable. On the contrary, it is said that castor oil *might* be employed "except for the solidification which castor oil and ·similar. vegetable oils undergo*es* upon prolonged heating."

. The specification itself pointed out the disadvantages of using oil without mixing sulphur with it.)

(3) Molten sulphur, used in lieu of oil.

(4) Sulphur mixed with sand, the sand being an "inert filler" and aside from its inertness having no function ·in the method.

(5) Glycerin.

No claim was presented ·specifying glycerin as an ingredient.

(6) "Some of the more complex alcohols." ·.

The specification does not define what is meant by "more complex alcohols," nor does it indicate what may be included as complex alcohols by use of the word "some." The brief· for appellants states, in substance, that that is a matter easily determinable by those skilled in the art.

.The specific liquid bath defined in allowed claims 7, 8, and 17 is composed of oil (presumably mineral) only; that in allowed claims 9 and 16 is composed of a mixture of oil and sulphur; and that defined in allowed claims 15 and 18 is composed of molten (melted) sulphur only.

No claim was presented, so far as the record shows, which called for a liquid bath composed of "glycerin," nor was any presented embracing use of "some of the more complex alcohols." ·

.In our opinion, appellants were allowed claims broad enough to. cover every patentable element which they. saw fit to disclose *and claim* in their application. Had they claimed a bath composed of glycerin, it would seem to have been allowable, so far. as the record· before us shows, but this

is purely . speculative. Whether, in the absence of a more definite explanation, a claim for a liquid bath composed of "some of the more complex alcohols" would have been allowable is ·problematical, but we need not dwell upon it, nor speculate about it.

. The only reason for referring to those factors—"glycerin" and "some of the more complex alcohols"—recited in the specification is that appellants rely upon them to support the broad claims here on appeal, neither of which specifies any ingredient of a liquid bath in which the laminated sheet material may be immersed.

Claim 19, *supra,* calls merely for a "liquid bath of high boiling point liquid maintained in an open vessel."

Claim 20, *supra,* calls for a "bath of high boiling point liquid chemically inert with respect to the laminated sheet material * * *."

It does not seem to us that appellants' specification teaches the utility of any bath which is lacking in qualities that chemically affect the resin in the laminated sheets. On the contrary, it expressly teaches, as quoted *supra,* that the phenomenon of softening the resin is not due merely to heat, "but requires the presence of heated liquid *having a quality of temporarily affecting the resin and most especially a heated liquid containing sulphur."* (Italics ours.)

That sulphur has a chemical effect upon substances with which it is used in industry is well known, and, so far as the instant case is concerned, it is not regarded material whether the effect be temporary or permanent. The important question is— What did appellants teach in the application as filed?

It is significant that at the time of filing the application appellants believed that a chemical reaction was present. Aside from what is stated in the specification, there is in the record an admission to this effect. · It is contained in their reason of appeal No. 7, when they carried the . case before the Board of Appeals. .Therein it is said:

"At the time of their application which was made under stress of war conditions and under a peculiar competitive situation,

applicants originally thought that the presence of sulphur might be an important factor, which factor is mentioned in their application, but it was later proved that the action was solely physical and not chemical. Under these circumstances the Examiner has erred in requiring that applicants observe the limitations normally imposed only on applicants who make an invention in the chemical field."

An affidavit of joint applicant Porter (who states that he has "no present interest in this application") is invoked by counsel for appellants in the effort to show that appellants were mistaken with respect to the matter of chemical reaction at the time their application was filed.

Assuming that to be true, of what avail is it to appellants? Their rights (or the rights of their assignee, if there be an assignee) must be determined by what they taught in their application—not by some subsequent discovery, particularly where such subsequent discovery contradicts, or runs counter to, the teaching of the application.

The decision of the Board of Appeals is affirmed.

Affirmed.

O'Connell, J., dissented.