42 C.C.P.A.(Patents)

**Application of Carl K. STEWART, Deceased, by Mabel R. Stewart, Administratrix, de bonis non.**

**Patent Appeal No. 6125.**

United States Court of Customs and Patent Appeals.

May 25, 1955.

748

Barnes, Kisselle, Laughlin & Raisch, Detroit, Mich. (John M. Kisselle, Detroit, Mich., of counsel), for appellant.

E. L. Reynolds, Washington, D. C. (S. W. Cochran, Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY and COLE, Judges.

COLE, Judge.

The decision of the Board of Appeals of the United States Patent Office affirming the Primary Examiner's rejection for lack of invention of claims 3, 4, 7, 8, 13 and 14 of appellant's application for a patent on a process for photomechanically reproducing engineering drawings is reviewed herein. Eight claims of the application were allowed.

Illustrative of the type of engineering drawing to be reproduced by the process defined in the appealed claims is the loft layout or master drawing which is prepared as a preliminary step in connection with the production of a particular new design of automobile, ship, airplane, or the like. This drawing is usually done in pencil on a white coated sheet of metal, and it is used to control the manufacture of tools and the accuracy of fabricated parts. The loft layout is itself frequently fabricated into a template for controlling or checking the accuracy of tools or fabricated parts. Many copies of the loft layout are generally required, extreme accuracy in the reproduction being absolutely essential.

Appellant's allegedly inventive process is directed to a series of steps for photo-mechanically reproducing and transferring the loft layout or other engineering drawing from one surface to another surface, each surface having a dimensionally-stable backing. Claims 3 and 4 are representative of those on appeal and read as follows:

"3. A process for photo-mechanically reproducing engineering drawings from lofts, master drawings and the like, which comprises coating a surface of a sheet of trans-parent glass with a very thin emulsion of the albumin ammonium dichromate type which is temporarily photo-sensitive and of a nature to form a transparent negative, placing the emulsion side of said sheet of glass in face contact with the drawing to be reproduced, exposing the emulsion to light transmitted through the glass and reflected from the drawing whereby the emulsion contacting the lines of the drawing is rendered water soluble and the remaining emulsion water insoluble, rolling up the exposed emulsion with an opaque backing material, wetting the entire exposed surface of the negative and while wet removing the water soluble emulsion and material covering same by a controlled spray of compressed air and water to accurately define the line between soluble and insoluble emulsion and thus reproduce the lines of the original drawing in the form of identical width clear lines on the surface of the glass, locating the negative thus formed in face contact with a photo-sensitive surface presented by a sheet of steel, glass and the like, exposing said last mentioned surface to light passing through the clear portions of the glass negative to produce, after processing said photo-sensitive surface, an accurate replica of the original drawing, said last mentioned photo-sensitive surface being such that the lines of said replica are defined by water insoluble material.

"4. Those steps in the process of photo-mechanically transferring engineering drawings from lofts, master drawings and the like to a sheet of steel, glass and the like by the contact method utilizing one or more negatives with transparent lines and opaque coating between the lines, which comprise spraying said sheet with an emulsion of the albumin ammonium dichromate type, of a nature to present a temporarily photo-sensitive surface, locating said nega-

tive in face contact with said surface, transmitting light through said transparent lines, processing said surface to produce a positive reproduction of said loft drawing, and removing the emulsion from between the lines forming said positive reproduction."

Appellant, in his brief, sets forth this more detailed chronology of the steps in his process which serves to better understand the claims:

"1. A transparent glass plate is sensitized with a transparent colloid-bichromate emulsion layer having a total thickness of less than 0.001 inches.

"2. The plate is positioned with its sensitized surface in contact with the dimensionally-stable drawing to be reproduced, which generally consists of thin pencil lines on a white opaque base.

"3. The assembly is exposed to a light source directed first through the transparent glass plate, and the light-sensitive layer to the drawing. At those areas of the drawing where there is a dark line the light will be absorbed. At those areas of the drawings which are white, the light will be reflected into the light-sensitive layer, causing the exposure. The exposure is adjusted so that the bichromated colloid becomes insoluble in water at all the areas overlying the white areas of the drawings, but remains soluble at those areas overlying the dark lines. This step of the process is generally known as 'reflex negative making'.

"4. The exposed negative is rolled up or coated with a thin coating of a greasy ink, which is a dark ink employed to make possible the adherence of lamp black to create absolute line definition resulting from this mechanically applied opaque layer.

"5. The inked plate is then developed by thoroughly soaking the plate in water so that, at those areas which represent the dark lines on the drawing, the bichromated colloid is dissolved in the water. The soluble portions of the emulsion and the ink covering are preferably removed by using a fine spray of compressed air and water. The specification also discloses the use of a cotton swab, but the use of a fine spray makes possible the removal of only the completely soluble, unexposed portions of the emulsion without affecting the other exposed areas. The removal of only the completely soluble portions of the emulsion results in a transparent line on the negative which is identical in width to the line on the drawing copied. The negative is opaque to actinic light at those areas which represent the white areas of the drawing, and because of this opaqueness of the ink layer the line definition is further accentuated and any dirty areas within the white areas are blocked out.

"6. A second plate of dimensionally-stable glass or steel is coated by spraying with a similar layer of bichromated colloid and the light-sensitive surface placed in contact with the negative resulting from steps 1 to 5.

"7. The assembly is exposed to light passing first through the negative, as in conventional contact printing, which renders the bichromated colloid insoluble in water at those areas represented by transparent lines on the negative.

"8. The exposed dimensionally-stable plate is coated with ink and the resulting plate developed with water to remove the soluble colloid to form a positive reproduction with the dark lines of the drawing formed of sharply defined water insoluble bichromated colloid covered with ink, the unexposed areas being clear. This removal of the emulsion defined by the white areas provides a clean original surface on which the draftsman may work in the same

manner as on the original loft, and the ink-coated insoluble lines are hardened so as to resist abrasion and drafting tool wear."

Appellant's process thus consists of a combination of steps characterized generally by use of a transparent glass plate sensitized with a bichromate (dichromate) emulsion, which is also transparent; bringing the sensitized plate into direct contact with the loft drawing to be reproduced; exposing the assembly to a particular source of exposure light which is transmitted through the transparent glass and emulsion to make the reflex negative; developing the negative by opaquing with ink, wetting, and then spraying utilizing compressed air and water to remove soluble portions of the emulsion and backing of ink and thus forming transparent lines on the negative; bringing the negative into contact with another similarly photo-sensitized surface in order to reproduce the drawing thereon; and finally removing the emulsion from the surfaces between the lines on the loft reproduction.

The emulsion used in appellant's process is not sensitive to ordinary factory illumination. No darkroom is therefore required.

In affirming the examiner's rejection of the appealed claims, the Board of Appeals relied upon the following references:

| Ullmann | 1,436,125 | Nov. 21, 1922 |
| Ullmann | 1,436,629 | Nov. 21, 1922 |
| Ullmann | 1,484,347 | Feb. 19, 1924 |
| Miller | 1,645,112 | Oct. 11, 1927 |
| Bloom | 2,122,404 | July 5, 1938 |
| Ford | 2,172,970 | Sept. 12, 1939 |
| Hutchison | 2,311,547 | Feb. 16, 1943 |

Specifically, appellant's process was found to be lacking in invention over Hutchison or Ford, or over either of them in view of Ullmann combined with Bloom or Miller.

The patent to Hutchison discloses use of the reflex method for reproducing loft drawings on a dimensionally-stable surface. The patentee shows the same general process as that disclosed by appellant herein, one main distinction between the two being in the type of negative material employed. Hutchison uses a piece of plate glass and adheres thereto a piece of photographic paper sensitized with an emulsion which is not sensitive to ordinary factory illumination. A silver halide emulsion is specifically contemplated by the patentee. Transmission of light in the Hutchison process is therefore through the glass sheet, the paper covering, and the emulsion. The reflex negative is used for printing a positive by the reflex method directly onto sensitized metal sheets of template stock to which a piece of photographic paper has been bonded.

The patents to Ullmann may be treated as a single reference as they relate to the same method of producing a reflex negative on a glass plate provided with a layer of bichromated colloid. The negative after development is dyed with a dye opaque to actinic light and is then ready for use in printing a printing plate. No darkroom is required in the Ullmann process, the light sensitive material not being sensitive to ordinary factory illumination.

The Ford patent discloses a process for reproducing engineering drawings on a dimensionally-stable surface by making a drawing, and copying the same by means of the reflex method onto metal stock coated with a mixture of water, engraving glue, and ammonium bichromate.

The patent to Bloom relates to a process for producing lithographic plates wherein the photo-sensitized surface of the plate consists of an ammonium bichromate solution mixed with an albuminous dye substance. The patentee discloses the usual method of printing on a printing plate coated with the bichromate emulsion; printing by contact with the reflex negative; coating the exposed plate with devoloping ink; and developing with water.

The patent to Miller relates to a method of photographic copying by the reflex method and teaches the backing up of a

photo-sensitive emulsion (silver halide or chromated colloid) with a layer of ink.

It is clear from the references of record that reflex negative making as such is old in the art. While the examiner and Board of Appeals, in their respective opinions, discussed the various steps of the claimed process at great length, and applied the references to meet every element of the combination set forth in the appealed claims, appellant states in his brief that the only issues before us are as follows:

"(1) The significance of the differences between applicant's method and the method disclosed in the reference Hutchison.

"(2) The interpretation of the Ullmann patents concerning the nature of the photo-sensitive emulsions disclosed therein.

"(3) Whether applicant is entitled to rely on the step of spraying to remove soluble portions of the emulsion as a distinguishing feature of the claimed method and whether this step is a patentable limitation."

Appellant admits that with two principal exceptions the appealed claims call for a combination of steps none of which are new *per se*. The first exception is that concerned with the forming of a negative with transparent lines. Appellant uses a transparent glass plate with an emulsion of the albumin ammonium dichromate type, which is also transparent, and thus produces a transparent negative. This negative is said to be transparent both before and after exposure although the appealed claims merely recite that the said emulsion is "of a nature to form a transparent negative." Appellant emphasizes this feature of the alleged invention because in his process the light rays are permitted to travel straight through the glass plate and into the transparent emulsion. Those light rays striking the white painted surface of the drawing are reflected and those rays striking the pencil lines under the emulsion are absorbed. Hence, the emulsion overlying the pencil lines remains water soluble while that overlying the painted surface of the drawing is rendered insoluble. The glass support and emulsion both being perfectly transparent, and no diffusion of light passing therethrough having resulted, appellant maintains that when the exposed negative is backed with ink and developed the transparent line on the negative is very sharply defined. Thus, appellant states, when the negative is printed on the transparent emulsion on the template stock, and the print developed by inking and washing away the soluble portions of the emulsion, a reproduction of far greater accuracy than any heretofore produced by prior art processes is made.

Bearing in mind that the gist of the claimed process is accuracy of reproduction, we now consider the process of the Hutchison reference. As aforesaid, Hutchison uses a silver-halide emulsion on a paper base which is laminated to a glass plate. Appellant argued before the board, as he does here, that exposure through this negative material, which he terms "translucent," causes diffusion of light, resulting in the scattering of light rays through the emulsion and the ultimate blackening thereof. As a consequence, appellant states that the lines produced on Hutchison's negative are not sharply defined, but, on the contrary, are bounded along opposite sides by a muddy gray area; and thus, when the negative is printed, the line definition will be indistinct as the line in the negative itself was blurred and indistinct. Furthermore, appellant states that the reproduction actually results in lines wider than those on the original drawing.

The Board of Appeals was of the opinion that while there was a definite difference between appellant's transparent negative material and Hutchison's translucent material, substitution of one for the other produced no new and unexpected result. The board approved the examiner's view that in the reflex method the light is passed through Hutchison's paper, emulsion, and then onto the original, but the only effect of the paper

was to diffuse the light prior to the striking of the emulsion. The board further held, in effect, that Ullmann taught the use of a chromated colloid emulsion for reflex printing, and since the various processing steps recited in the appealed claims were conventional ones for a bichromated colloid it would be obvious to the worker skilled in the art to so modify the Hutchison process. The pertinency and application of Bloom and Miller as teaching the use of opaquing ink in Ullmann (instead of the latter's dye) is not here disputed. The reasons for the board's rejection on Ford were not fully developed, but in the view we take of this case it is not necessary to consider that reference.

■■■■ It is true, of course, that a combination of steps is not necessarily unpatentable merely because each individual step is old in the art. The combination is unpatentable, however, notwithstanding the presence of improvement, if it is, in view of the prior art, an obvious expedient to the worker skilled in such art. We have given careful study to the record and briefs herein, particularly to appellant's interpretation of the effect of the exposure light passing through Hutchison's negative material. As indicated, the board believed that appellant's contention in this respect was technically unsound. The Solicitor for the Patent Office, in his brief, has also challenged appellant's position by stating that blurring or fogging occur only where the emulsion is of considerable thickness, and points out that the claims on appeal place no definite limitation on the thickness of the emulsion other than to state that it is "thin." Regardless of which theory is correct, an issue we do not decide, it is our opinion that there is ample suggestion for appellant's modification of Hutchison's process in the Ullmann patents. There can be little doubt, and appellant does not otherwise contend, that an emulsion of the albumin ammonium dichromate type includes any bichromated colloid. In copying drawings, bichromated colloid techniques are admittedly old in the art,

but even assuming that Hutchison's disclosure does not include the concept of using a bichromated colloid, and being cognizant of the possible effect of Hutchison's paper backing for the emulsion, the propriety of the board's rejection is clearly demonstrated by the following from the solicitor's brief:

"The appellant's objections to the combination of Ullmann with Hutchison are obviously not well taken. If the art lacked a teaching that a transparent bichromate emulsion coated on glass had an advantage in reproducing a drawing by reflex printing, the Ullmann patents supplied the need. The patents include the explicit statement, for example, that 'As the latter (the glass plate and the emulsion) are transparent obviously the image would show with practically complete intensity.' Whatever reasons Hutchison had for not using the Ullmann negative (lack of actual knowledge thereof, for example), it is clear that experts in the art should be left free to improve Hutchison's process by adapting to it known photographic methods. This is particularly true since Hutchison expressly suggests that his process is not limited to any particular emulsion or backing material.

"As to whether the Ullmann dichromate emulsion is 'transparent,' as Ullmann states at several points or 'translucent,' as appellant contends and Ullmann indicates at other points in his disclosure, it should be noted that the claims call for an emulsion 'of a nature to form a transparent negative.' The claims do not call for an emulsion which is transparent prior to exposure and development.

"Thus, the claims raise only the issue whether Ullman's emulsion is such that, after exposure and development, transparent lines are left on the negative. This is undeniably true since Figure 4 of patent No. 1,436,125 [of record herein], for

example, shows total removal of the soluble portion of the film, a fact which is supported by the specification. The Ullmann emulsion is therefore one which is 'of a nature to form a transparent negative' and answers to the claim in the same way as appellant's emulsion. Even if the claims were directed to an emulsion which was initially 'transparent,' it is submitted that Ullmann is anticipatory. The portions of the patents using that term would not be ignored by experts in the art. Moreover, most dictionaries list 'transparent' as **a** synonym for 'translucent.' "

Appealed claims 3, 7, 8, and 13 call for the step of wetting the entire exposed surface of the negative and while wet removing the water soluble emulsion by a controlled spray of compressed air and water. Appellant urges that none of the references show this step and that it is a new and patentably distinguishing feature of his process. In his brief, appellant states that loft drawings are usually worked on by several men from a period of time extending from several weeks to many months, and that very often, because of the large size of such drawings, it is necessary that they be stepped or crawled on; that, consequently, the painted surface of the loft becomes dirty and the contrast between the drawn lines and original white background is very slight; that when a reflex negative is made of the dirty loft drawing there is a very sensitive line of demarcation between the completely soluble unexposed portion of the emulsion directly overlying the pencil lines, and the partially soluble exposed portions resulting from partial exposure of the dirty surface adjacent the pencil lines; that in developing the negative of such a dirty loft drawing by washing with ordinary expedients, such as a cotton swab, not only the completely soluble portions of the emulsion are washed away but also some of the partially soluble portions; and that sharp line definition, so vitally essential to an ac-curate reproduction, is therefore not achieved by prior art washing methods. Appellant states further in his brief that whereas the cotton swab will work satisfactorily if the loft drawing is clean, 99% of such drawings have dirty surfaces. To secure sharp and accurate line definition in connection with the reproduction of these dirty lofts, appellant claims that his spray of compressed air and water enables washing away of the completely soluble portions of the emulsion without washing away the partially soluble portions. Henceforth, according to appellant, he is able only through use of the spray to translate the very slight contrast differential between the lines and the dirty background of the loft drawing to the absolute contrast in the negative reproduction of these lines and the background. Appellant controls his spray so that the agitation imparted to the water particles by means of the compressed air is just sufficient to overcome the cohesion between the soluble and partially soluble portions of the emulsion.

While the foregoing from appellant's brief commendably and with great particularity outlines the advantages of his spray over the cotton swab, the pertinent part of his specification reads as follows: (omitting reference numerals.)

"The glass plate with its backing up material of etching ink is next placed in a developing sink, * * * and subjected to flowing water, the plate is thoroughly soaked so that no dry spots remain and is so allowed to soak for approximately eight minutes so as to loosen the soluble emulsion under the ink. It will be remembered that only the portions of the emulsion which were originally in contact with the lines of the drawing are soluble in water. *The soluble portions of the emulsion and the ink covering therefor may be removed by a gently applied cotton swab, but the removal of the soluble emulsion is greatly hastened by the use of a spray gun utilizing compressed air and water.* * * * The air pressure and water will

remove all the soluble emulsion and backing of ink and the line between the insoluble emulsion and the soluble emulsion will be well defined because of the greater length of time the emulsion is exposed. In other words, the line between solubility and insolubility is well defined. The result is a negative identical in all respects with the original loft drawing with the exception that the lines are now white as formed by the clear glass of the plate and the portions [on the negative] are black. By following the above described process there is and can be no appreciable difference in the width of the line defined by the clear glass of the negative and the width of the original black line on the loft. [Italics ours.]"

It is clear from appellant's specification disclosure, contrary to the assertions in his brief, that he teaches the use of a spray as a preferable washing medium merely because it hastens the speed with which the negative can be developed. In other respects, appellant does not suggest that there is any difference in the final result between use of the spray and use of the swab, the latter being a known washing expedient. In effect, appellant implies in his application that the two washing means are virtually equivalent except that the spray hastens development time. Where the disclosure of an application gives two materials or operations as equivalents, we have many times held that such disclosure alone may be sufficient for the rejection of claims specific to one equivalent where the other appears in the prior art. See In re Borcherdt, 197 F.2d 550, 39 C.C.P.A., Patents, 1045, and cases therein cited. Appellant urges in his brief, however, that the controlled spray of compressed air and water, and only that expedient, permits the accurate reproduction of dirty lofts and, in doing so, patentably distinguishes over the prior art. He admits that the claimed beneficial result of the spray over the swab was unknown to him at the time

of the filing of the application, and was only discovered through subsequent work with the process. He contends that he is entitled to all the benefits of the invention disclosed by him even though he was not aware of certain advantages or the scientific reasons underlying such invention. We have taken into consideration the cases cited by appellant in support of this contention, but do not find them applicable here. Appellant is predicating his claim to patentability of the spray on an unexpected result which is not disclosed in his specification. Manifestly, unexpected results sufficient to spell out patentability must be disclosed, not in briefs or affidavits filed in support of such patentability, but instead in the specification itself. In adjudging, in the first instance, a patent applicant's right to a patent, we are guided in our determination by that which is taught in the application and not by some subsequent undisclosed discovery. For a related situation, see In re Porter, 184 F.2d 198, 38 C.C.P.A., Patents, 710.

In its opinion, the Board of Appeals held that while appellant's spraying operation possibly resulted in more effective washing, the unexpected results claimed were obvious in view of Ullmann 1,436,125. We have read this patent, but are unable to find wherein that reference teaches or remotely suggests the use of a controlled spray of compressed air and water, or comparable medium, in the accurate reproduction of dirty loft drawings. Of course, there is no invention *per se* in using such a spray in place of a swab, but it does not necessarily follow, if appellant is correct in claiming all he does for his spray, that under no circumstances could the spray be considered a patentable feature of his process. While obviousness is basically a question of fact, we think a proper rejection of appellant's spray feature requires the citation of prior art which reasonably suggests it. Ullmann, in our opinion, does not. As aforesaid, however, appellant's failure to explicitly disclose in his application the unexpected advantages of the spray, upon which he

relies for patentability, leaves us no alternative other than to sustain the rejection of appealed claims 3, 7, 8, and 13.

For the reasons hereinbefore stated, the decision appealed from is affirmed.

Affirmed.