**Jackson B. HESTER, Jr., Appellant,**

**v.**

**Hans ALLGEIER and Andre Gagneux, Appellees.**

**Appeal No. 80–535.**

United States Court of Customs and Patent Appeals.

March 19, 1981.

Sidney W. Russell, Peter J. Georges, Arlington, Va., John T. Reynolds, John Kekich, Kalamazoo, Mich., for appellant.

Joseph G. Kolodny, New York City, John J. Maitner, Saddle Brook, N. J., Karl F. Jorda, Ardsley, N. Y., for appellees.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

MILLER, Judge.

This is an appeal from the decision of the Patent and Trademark Office ("PTO") Board of Patent Interferences ("board") which awarded priority of count 2 to senior party Allgeier et al. ("Allgeier"). We vacate and remand.

## BACKGROUND

*Count 1*

The applications in interference [1] relate to central nervous system tranquilizers in a class known as triazolo benzodiazepines ("triazolos"). The generic triazolo known in the prior art is represented by the structural formula shown below:

---

1. The interference was declared on January 23, 1975, between Hester's application serial No. 201,207, filed November 22, 1971, which is a continuation-in-part of application serial No. 138,278, filed April 28, 1971, and Allgeier's application serial No. 199,770, filed November 17, 1971, which was entitled to the benefit of Swiss application No. 17352/70, filed November 23, 1970.

The interference was declared on only count 1,[2] drawn to a triazolo genus. The compounds of genus count 1 differ from the prior art triazolos only in the attachment of hydroxymethyl-, alkoxymethyl-, or alkonoyloxymethyl- instead of methyl- at the 1-position on the triazolo ring. Priority on count 1 was eventually awarded by the board to Hester based on his reduction to practice of ethoxymethyltriazolo ("ether"),[3] an ether compound of genus count 1, prior to the effective filing date of Allgeier. Allgeier does not appeal this award of priority.

*Count 2—Primary Examiner's Sua Sponte Motion*

On June 19, 1975, during the motion period, Allgeier moved to substitute two subgenus counts for count 1.[4] In support of

**2.** A 1-substituted 6-phenyl-4H-s-triazolo [4,3-a][1,4]-benzodiazepine of the formula:

wherein R is selected from the group consisting of hydroxy and alkoxy, in which the alkyl moiety is of 1 to 3 carbon atoms, inclusive,

$$-O\overset{\overset{\displaystyle O}{\|}}{C}-(CH_2)_n-CH_3 \text{ in which n is 0 to 16;}$$

$$-O\overset{\overset{\displaystyle O}{\|}}{C}-(CH_2)_{n'}-\overset{\overset{\displaystyle O}{\|}}{C}-OR' \text{ in which n' is 2 to 3 and}$$
R' is hydrogen, or alkyl defined as above, benzoyloxy, and phenylacetoxy; wherein $R_1$ is selected from the group consisting of hydrogen and alkyl of 1 to 3 carbon atoms, inclusive; and wherein $R_2$, $R_3$, $R_4$, and $R_5$ are selected from the group consisting of hydrogen, alkyl of 1 to 3 carbon atoms, inclusive, halogen, nitro, cyano, trifluoromethyl, and alkoxy, alkylthio, alkylsulfinyl, alkylsulfonyl, alkanoylamino and dialkylamino in which the carbon chain moieties are of 1 to 3 carbon atoms, inclusive, and the pharmacologically acceptable acid addition salts thereof.

**3.** The ether is, in pertinent part, shown by the structural formula:

wherein $R_1$ is selected from the group consisting of hydrogen and alkyl of 1 to 3 carbon atoms, inclusive; and wherein $R_2$, $R_3$, $R_4$, and $R_5$ are selected from the group consisting of hydrogen, alkyl of 1 to 3 carbon atoms, inclusive, halogen, nitro, cyano, trifluoromethyl, and alkoxy, alkylthio, alkylsulfinyl, alkylsulfonyl, alkanoylamino and dialkylamino in which the carbon chain moiety are 1 to 3 carbon atoms, inclusive, and the pharmacologically acceptable acid addition salts thereof.

**B.** A 1-substituted 6-phenyl-4H-s-triazolo [4,3-a][1,4] benzodiazepine of the formula

wherein R is selected from the group consisting of alkoxy, in which the alkyl moiety is of 1 to 3 carbon atoms, inclusive,

$$-O\overset{\overset{\displaystyle O}{\|}}{C}-(CH_2)_n-CH_3 \text{ in which n is 0 to 16;}$$

$$-O\overset{\overset{\displaystyle O}{\|}}{C}-(CH_2)_{n'}-\overset{\overset{\displaystyle O}{\|}}{C}-OR' \text{ in which n' is 2 to 3 and}$$
R' is hydrogen, or alkyl defined as above, benzoyloxy, and phenylacetoxy; wherein $R_1$ is selected from the group consisting of hydrogen and alkyl of 1 to 3 carbon atoms, inclusive; and wherein $R_2$, $R_3$, $R_4$, and $R_5$ are selected from the group consisting of hydrogen, alkyl of 1 to 3 carbon atoms, inclusive,

**4.** Subgenus counts A and B are:

**A.** A substituted 6-phenyl-4H-s-triazolo [4,3-a][1,4]-benzodiazepine of the formula

the motion to substitute, Allgeier filed a declaration by Alexandra Delini-Stula, physician and pharmacologist, a citizen of Yugoslavia and resident of Switzerland, which compared the anticonvulsive action of three compounds:

I. 6 - Phenyl - 8 - chloro - 4H - s - triazolo [4,3-a][1,4] benzodiazepine - 1 - methanol described in [Allgeier's] US Patent Application Serial No. 199,770

II. 1-(Methoxymethyl)-phenyl-8-chloro-4H-s-triazolo [4,3-a][1,4] benzodiazepine

III. 1-(Ethoxymethyl)-6-phenyl-8-chloro-4H-s-triazolo [4,3-a][1,4] benzodiazepine described in [Hester's] US Patent Application Serial No. 138,276

Three anticonvulsive tests were described in the declaration as follows:

a) *Anticonvulsive action.*
*Pentetrazole convulsion test on the mouse*

The test substance is administered orally in increasing doses to male white mice weighing 17–25 g. Ten Animals are used for each dose of test substance. Sixty minutes after administration of the test substance, 80 mg/kg of 0.8% solution of pentetrazole is injected intraperitoneally. An assessment by observation is made of the occurrence of clonic and tonic convulsions, as well as of a Straub's tail position. The observation time extends over two hours after administration of the pentetrazole.

The dose of the test substance is determined in mg per kg which, in the case of 50% of the animals, inhibits the clonic seizures produced by the intraperitoneal injection of 80 mg/kg of pentetrazole.

b) *Anticonvulsive action*
*Strychnine survival rest [sic] on the mouse*

The anticonvulsive action is determined in white mice weighing 17–25 g. The test substance is administered to the animals per os in different increasing doses. After 60 minutes, 2,5 mg/kg of strych-

nine is administered intraperitoneally in the form of a 0,025% aqueous solution of strychnine nitrate.

The dose of the test substance in mg per kg body weight is determined whith [*sic*] which 50% of the animals survive the time of 10 minutes ($DE_{50}$). The time is arbitrarily chosen but it is an invariable feature of the test method.

c) *Anticonvulsive action,*
*Electro shock test on the mouse*

The substance to be tested is administered per os in different increasing doses to male albino mice weighing 18 to 22 g. Ten mice are used per dosis. 60 minutes after administration of the test substance, the mice are shocked by an alternating current of 50 Hz, 16 mA during 0.2 seconds through electrodes placed on the corneae. This treatment provokes a tonic extension cramp of the hind legs which is estimated as being significant if it lasts longer than 4 seconds.

The dose of the test substance is determined in mg per kg bodyweight which, in the case of 50% of the animals, inhibits the tonic extension cramp.

The test results were set forth in tabular form:

| Substance | Pentetrazole convulsion test $DE_{50}$, mg/kg mouse p.o. | Strychnine Survival test $DE_{50}$, mg/kg mouse p.o. | Electro shock test $DE_{50}$, mg/kg mouse p.o. |
|---|---|---|---|
| I | 0,25 | 3,6 | 2.1 |
| II | 2,8 | 5,3 | >25 [3] |
| III | about 2 [1] | about 50-200 [2] | 39 |

1) Results with 3 doses:

| | |
|---|---|
| 0,5 mg/kg | 0% inhibition |
| 2,0 mg/kg | 50% inhibition |
| 5,0 mg/kg | 100% inhibition |

2) The following results of the 4 tests series do not enable the determination of the $DE_{50}$ to be made:

| | |
|---|---|
| 10 mg/kg | 30% survivals |
| 100 mg/kg | 90% survivals |
| 200 mg/kg | 30% survivals |
| 200 mg/kg | 40% survivals |

3) with 25 mg/kg 40% inhibition.

halogen, nitro, cyano, trifluoromethyl, and alkoxy, alkylthio, alkylsulfinyl, alkylsulfonyl, alkanoylamino and dialkylamino in which the carbon chain moieties are of 1 to 3 carbon atoms, inclusive, and the pharmacologically acceptable acid addition salts thereof.

**516**

The conclusion reached was:

Substance I, 6-phenyl-8-chloro-4H-s-triazolo[4,3-a][1,4]benzodiazepine-1-methanol containing a free hydroxy group, shows higher activity than the corresponding low alkyl ethers, compounds II and III in all three tests which provide conclusive evidence of anticonvulsive properties. In two of the three tests the activity of compound I is at least ten times higher than that of compounds II and III.

After consideration of Hester's opposition to Allgeier's motion to substitute counts and Allgeier's reply to Hester's opposition, the primary examiner, in a decision dated February 5, 1976, denied Allgeier's motion. He noted that "Allgeier has failed to comply with the requirements of 37 C.F.R. 1.231(a)(2) [5] that he demonstrate the patentability of the counts to all parties and apply the counts to all involved applications." He went on to say:

The Delini-Stula declaration does not establish that all of the alcohol compounds of Proposed Count A are patentably distinct from the remaining members of the present count or Proposed Count B, although it does indicate that the single specific compound discussed therein is patentably distinct from the genus of the

**5.** 37 C.F.R. 1.231(a)(2) provides:

§ 1.231   Motions before the primary examiner.

(a) Within the period set in the notice of interference for filing motions any party to an interference may file a motion seeking:

. . . .

(2) To amend the issue by addition or substitution of new counts. Each such motion must contain an explanation as to why a count proposed to be added is necessary or why a count proposed to be substituted is preferable to the original count, must demonstrate patentability of the count to all parties and must apply the proposed count to all involved applications except an application in which the proposed count originated.

**6.** The relevant structure of species count 2, 6-phenyl-8-chloro-4H-s-triazolo[4,3-a][1,4]benzodiazepine-1-methanol ("methanol") is:

present count. Compare *In re Wetterau,* 356 F.2d 556; 148 USPQ 499.

. . . .

Inasmuch as the Allgeier motion and its supporting declaration are persuasive that the compound [of species count 2] of the declaration is patentably distinct from representative members of the genus of Count 1, the Primary Examiner hereby moves to add the following proposed Count 2 to the interference:

*Proposed Count 2:*

6-phenyl-8-chloro-4H-s-triazolo[4,3-a][1,4]benzodiazepine-1-methanol.[6]

*This motion is granted.* Support for the proposed count is found in the Hester application 317,618 at Example 13, and in the Allgeier application 199,770 at Example 17. Support for the proposed count is also found in the Example of Allgeier's Swiss application 17,352, filed November 23, 1970 . . . .

. . . .

No reconsideration—Rule 231(d),[7] last sentence.

On April 2, 1976, Hester petitioned the Commissioner of Patents and Trademarks ("Commissioner") "to set aside and reverse the [primary] Examiner's Decision with re-

**7.** 37 CFR 1.231(d):

All proper motions as specified in paragraph (a) of this section, or of a similar character, will be transmitted to and considered by the primary examiner without oral argument, except that consideration of a motion to dissolve will be deferred to final hearing before a Board of Patent Interferences where the motion urges unpatentability of a count to one or more parties which would be reviewable at final hearing under § 1.258(a) and such unpatentability is urged against a patentee or has been ruled upon by the Board of Appeals or by a court in ex parte proceedings. Also consideration of a motion to add or remove the names of one or more inven-

gard to the addition of species count 2 proposed *sua sponte* by him, without any motion of either party directed to him suggesting same . . . ."

In a decision dated May 11, 1976, the Commissioner did not address the propriety of the primary examiner's *sua sponte* motion *per se*, but did treat Hester's petition

as a request for reconsideration of the sua sponte action of the Primary Examiner and pursuant thereto, *Allgeier is given . . . two months from the mailing date of this decision on petition* to respond to the Hester petition. The interference file will remain under the jurisdiction of the Patent Interference Examiner, who upon receipt of the Allgeier response, will then transmit the interference file to the Primary Examiner for treatment of the case consistent with this decision on petition.

In a decision dated November 23, 1976, the primary examiner noted, without discussing the propriety of his *sua sponte* motion *per se*, that "it appears that the record is uncontradicted that the hydroxymethyl [methanol] compound [of count 2] has substantially greater initial potency, *i. e.* faster onset of action, than the corresponding ether compounds" and reiterated his decision to grant the *sua sponte* motion to add count 2.

On December 10, 1976, Hester again petitioned the Commissioner to "set aside and reverse" the primary examiner's decision, arguing that "[u]nder the Rules of Practice and under the M.P.E.P., the Examiner has no authority to propose, sua sponte, an additional species Count 2 in this interference," and observing that the primary examiner's "decision did not flatly rule as to the merits of . . . [Hester's first petition to the Commissioner] . . . and particularly the issue of sua sponte insertion of Count 2."

In a decision dated March 25, 1977, the Commissioner stated that

[i]n the petition it is argued that the action of the Primary Examiner in adding, *sua sponte*, count 2 to the issue of interference was unauthorized and improper. This argument was considered and disposed of in paragraph 3, page 3 of a decision on petition mailed May 11, 1976, so that there is no need to consider this matter again. Hester did not present any timely petition for reconsideration of this earlier decision on petition.

The cited paragraph 3 of the Commissioner's decision mailed May 11, 1976, states:

Adverting to the petition proper, Hester states in part that the Primary Examiner had no right to add a count sua sponte. Hester cites *Moore v. Hignett*, 152 USPQ 337 (Comm.Pat.1966) in support of this contention. The cited decision is inapposite since the facts therein are readily distinguished from those in the instant case. In the Moore case, neither party moved to add or substitute counts. Thus, both parties were apparently satisfied with the counts set forth in the original declaration of interference. This is not the situation in the instant case since Allgeier, in moving to substitute proposed counts A and B for the existing count, was obviously not satisfied with the latter. Accordingly, the *Moore v. Hignet* decision is not controlling, as urged by Hester.[8]

*Count 2—Patentable Distinctness—Parties' Evidence*

In response to the Delini-Stula declaration filed by Allgeier, Hester's assignee (the Upjohn Company) conducted tests on the same three compounds and submitted the test data in three affidavits (Philip Von Voigtlander, PhD, Lester M. Reineke, and

---

tors may be deferred to final hearing if such motion is filed after the times for taking testimony have been set. Requests for reconsideration will not be entertained.

8. We note that 37 CFR 1.231(a)(2), note 5 *supra*, arguably, neither provides for nor forbids a primary examiner's *sua sponte* motion to add or substitute counts. Because neither party

has raised the issue in this appeal, we express no opinion on whether the primary examiner is a proper movant under 37 CFR 1.231. Nor do we express an opinion regarding the applicability of *Moore, id.*, or *Busse v. Williams*, 37 USPQ 283 (Comm'r Pats. 1936), to the facts of this case.

**518**

Floyd S. Eberts, Jr.). The Von Voigtlander affidavit establishes that the methanol compound exhibited greater activity as an anticonvulsant than the ethoxy compound during an initial time period of thirty minutes after treatment, but that at the end of four hours the activities of the two compounds were about equal. The Reineke affidavit relates to the metabolic fate of the 1-ethoxy ether compound, presents data showing that 24 hours after injection of a dog with the 1-ethoxy ether compound, only the methanol compound was present, and concludes that the 1-ethoxy ether "is metabolized to an extensive extent into . . . [the methanol]." The Eberts affidavit states that the affiant studied the Reineke affidavit and agrees with the conclusion found therein.

Allgeier maintained that the three affidavits filed in behalf of Hester failed to contradict the conclusions in the Delini-Stula declaration. Allgeier also filed, on August 23, 1976, a declaration of Dr. Werner P. Koella setting forth the results of experiments conducted to provide more complete data and to confirm the earlier Delini-Stula work. Table 1 of this declaration shows that the methanol compound is superior in potency compared to the ether compound and that the potency was maintained over a 4–5 hour period. Allgeier also submitted affidavits of Dr. Jeffrey Saelens, Dr. Spencer Tripp, and Mrs. Hanna Sylwestrowicz which alleged deficiencies in the affidavits submitted in behalf of Hester. In particular, the Saelens affidavit states that oral administration of therapeutic anticonvulsants (method of Allgeier) was the typical method, that intraperitoneal administration (method of Hester) was "never used," and that, therefore, the tests conducted on behalf of Hester were not conclusive of parallel behavior of the compounds after oral administration.

*Count 2—Patentable Distinctness—Parties'*
  *Arguments Below*

In his petition to the Commissioner dated April 2, 1976, Hester also argued that he had no opportunity "to present evidence that the [Primary] Examiner's count 2 represents a species not patentably distinct from any other species encompassed by the generic count 1 upon which this interference was initially instituted." In addition to emphasizing the "close utility and metabolic relationship between the alcohol or methanol form and the methoxy and ethoxy forms of the compounds," which he stated is shown by the Von Voigtlander, Reineke, and Eberts affidavits,[9] Hester argued, for the first time, that Allgeier's 1970 Swiss application, upon which Allgeier relies solely for date of reduction to practice, concedes that the methanol compound was equivalent to the ethoxy compound, and he cited the following portion of Allgeier's Swiss application:

> "It has now been found, these compounds, especially 6-phenyl-8-chloro-4H-s-triazolo[4,3-a][1,4]benzodiazepine-1-*methanol* and *1-benzyloxymethyl* -6-phenyl-8-chloro-4H-s-triazolo[4,3-a][1,4]benzodiazepine, possess variable pharmacological properties and *high therapeutic index.*" [Emphasis added by Hester.]

Hester also quoted a statement by counsel for Allgeier during prosecution of Allgeier's corresponding U.S. application:

> " * * * It is also quite apparent *to anyone skilled in the art* that the proviso of a working Example as to how to use the benzyloxy would not limit a chemist *solely to that particular group but would teach him to use simple substituted benzyloxy groups for the same purpose.* In applicants' priority document, it is noted at page 1, the 3rd paragraph, that the benzyloxy compound *is useful pharmacologically.* However, it is also noted at page 4, the last paragraph going to page 5, that an arylmethyl group, for example, the benzyloxy *or any other simple substituted benzyloxy compound* can be used to split off said group to arrive at the pharmacological useful hydroxy compounds which are also part of the instant invention. This utility applies and *includes the*

---

9. As related earlier, these affidavits relate to the methanol compound and the 1-ethoxy ether compound. They are silent on the methoxy compound.

*p-methoxybenzyloxy* group. * * * "
[Emphasis added by Hester.]

In Hester's view, these statements amounted to admissions of equivalency of the ether and alcohol species, were, therefore, under *In re Skoll*, 523 F.2d 1392, 187 USPQ 481 (CCPA 1975), binding on both Allgeier and the primary examiner, and established that the methanol species is unpatentable over the ether species.

Throughout the proceedings below, the examiner, the Commissioner, and Allgeier agreed that Allgeier's Delini-Stula declaration, showing some ten times higher anticonvulsive activity of the methanol species during the first half hour, supports a finding of patentable distinctness of the count 2 methanol over the count 1 genus.

*The Board*

In a decision dated September 13, 1979, the board awarded priority of genus count 1, which covers the esters, ethers, and alcohols in the 1-position, to Hester because Allgeier conceded that Hester reduced to practice the ether prior to the effective filing date of Allgeier.

Assuming, *arguendo*, that the ether and the methanol represent the same inventive concept, the board said in its opinion:

> [I]t is well settled that reduction to practice of one member of a group of equivalent species does not constitute a reduction to practice of another for the purpose of awarding priority in an interference contest. This is without regard to how obvious one species is over the other, *Wetmore v. Quick*, 536 F.2d 937, 190 USPQ 223 at 228 (CCPA 1976); *Rainer v. Unger*, 51 CCPA 1491, 333 F.2d 244, 142 USPQ 23 (1964); and *Smith v. Stone*, 57

CCPA 884, 420 F.2d 1065, 164 USPQ 543 (1970).

It concluded that priority to Hester of count 2 could not be based on the prior reduction to practice of the ether.

The board declined a request by Hester under 37 CFR 1.259[10] to remove count 2 from the interference, saying:

> For us to consider whether or not count 2 is patentably distinct from count 1 would amount to a review of the propriety of the examiner's sua sponte motion to amend. However, we are without authority to make such an inquiry pursuant to 37 CFR 1.258 inasmuch as the issue of amending counts is not ancillary to priority. *Godtfredsen v. Banner*, 598 F.2d 589, 202 USPQ 7 (CCPA 1979). Patentable distinctness of counts must be resolved during the motion period or, if necessary, in subsequent ex parte prosecution.
>
> Insofar as 37 CFR 1.259 is concerned, action thereunder is discretionary with this board. *Allen v. Blaisdell*, 39 CCPA 951, 196 F.2d 527, 93 USPQ 428 (1952); *Loshbough v. Allen*, 54 CCPA 1113, 373 F.2d 747, 152 USPQ 812 (1967). It is only under the most compelling of circumstances or in a clear-cut case that we would exercise our discretion in order to avoid manifest error. *Brader v. Schaeffer*, 193 USPQ 627, at 630 (Bd.Pat.Int. 1976). We find no such compelling circumstances or clear-cut case here and decline to make any recommendation to the Commissioner pursuant to § 1.259.
>
> Accordingly, we will award priority as to count 2. It should be kept in mind, however, that we are expressing no opinion as to patentable distinctness of count

10. § 1.259 Recommendation by Board of Patent Interferences.

The Board of Patent Interferences may, either before or concurrently with their decision on the question of priority, but independently of such decision, direct the attention of the Commissioner to any matter not relating to priority which may have come to their notice, and which in their opinion establishes the fact that no interference exists, or that there has been irregularity in declaring the same, or which amounts to a bar to the grant of a patent to either of the parties for the claim or claims in interference. The Commissioner may suspend the interference and remand the case to the primary examiner for his consideration of the matters to which attention has been directed if such matters have not been considered before by the examiner, or take other appropriate action. If the case is not so remanded, the primary examiner will, after judgment on priority, consider such matters, unless the same shall have been previously disposed of by the Commissioner.

2 over count 1. Our decision should in no way effect [*sic*] any possible future proceedings regarding this issue.

In Hester's brief before the board, the issue of "best mode" was raised for the first time, Hester arguing that if, in fact, the count 2 compound was patentably distinct because it had unexpectedly advantageous properties over other species of the count 1 genus, then Allgeier's failure to so disclose amounted to a failure to comply with the "best mode" requirement of 35 U.S.C. § 112.[11] The board accepted Hester's reasons [12] for belatedly raising the issue of best mode but disagreed with Hester's interpretation of *Weil* note 12, *supra*. In the board's view, *Weil* held "that the issue of *benefit* (35 USC 119 or 120) was ancillary and that the benefit case [*sic* disclosure] must comply with the 'best mode' requirement."

Specifically considering the Allgeier applications under section 112, the board noted that—

[t]he specific compound of count 2 is exemplified in both the Swiss and the involved applications. More is not required. We know of no requirement that those specific advantages of a compound upon which patentability may be based be delineated in a disclosure—it is enough that the basic property or utility is disclosed. *In re Davies*, 475 F.2d 667, 177 USPQ 389 (CCPA 1973). It is not urged by Hester that the basic property or utility is not disclosed. Moreover, as is apparent from *Weil v. Fritz*, 601 F.2d 551, 202 USPQ 447 (CCPA 1979) (the ensuing decision) the burden is upon Hester to establish that Allgeier did not disclose the best mode. Hester must show that Allgeier had *concealed* (intentionally or otherwise)

the best mode. See *In re Gay*, 50 CCPA 725, 309 F.2d 769, 135 USPQ 311 (1962); *In re Bosy*, 53 CCPA 1231, 360 F.2d 972, 149 USPQ 789 (1966); and *In re Glass*, 492 F.2d 1228, 191 USPQ 31 (1974). This Hester has not done.

The board awarded priority of count 2 to Allgeier because, as senior party, Allgeier was presumed to be the first inventor of the subject matter of count 2.

*The Parties' Positions on Appeal*

Hester argues that the board's decision on the best mode issue is in error because it used the general expressions of utility relating to count 1 to support an allegedly *separate* inventive concept, count 2; that count 2 can only be in this interference if: (a) count 2 is inventively different from count 1, and (b) the utility of count 2 is disclosed in the applications of both parties and complies with 35 U.S.C. § 112 regarding "higher activity" of the count 2 methanol; that the allegation of "higher activity" is nowhere disclosed in any Allgeier application and, therefore, cannot be a proper basis for an award of priority; that the only support for such activity is in the ex parte, ex post facto, nunc pro tunc and self-serving foreign pharmacologist's (Delini-Stula's) declaration introduced after the interference was initiated; and, finally, that the board ignored Hester's live and uncontroverted testimony, which establishes the inaccuracy of the foreign declaration and the equivalence of the count 1 ether to the count 2 methanol.

Allgeier argues that Hester did not begin synthesis of the count 2 methanol until January 4, 1972, two years *after* Allgeier's priority date, so that it is inconceivable that Hester could be the prior inventor; that the

---

11. § 112. Specification
   The Specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

12. Hester argued that the motion could not have been raised during the motion period because there was no way of his knowing that the primary examiner would *sua sponte* add count 2 to the interference; also, that it was not until after the motion period that the decision in *Weil v. Fritz*, 572 F.2d 856, 196 USPQ 600 (CCPA 1978) was reported, holding, for the first time, that the issue of "best mode" was ancillary to priority.

Delini-Stula declaration shows the unexpected activity of the count 2 methanol and the test results "are in line with those obtained by Hester"; that Allgeier's applications disclose the count 2 methanol; and, further, that best mode is not ancillary to priority and is not properly before this court. According to Allgeier, *Weil, supra* note 12, overruled *Thompson v. Dunn*, 35 CCPA 957, 166 F.2d 443, 77 USPQ 49 (1948), only when a 35 USC 120 benefit is sought and otherwise affirmed *Thompson* in regard to the best mode issue.

Hester replies that Allgeier inconsistently asserts that count 2 has an "advantage" in order to support separate inventiveness while simultaneously relying on an application that does not disclose the advantage; that Allgeier's brief is incomplete because it ignores *In re Stewart*, 42 CCPA 937, 222 F.2d 747, 106 USPQ 115 (1955), which is the controlling case holding that an applicant may not predicate his claim to patentability on an unexpected result not disclosed in his specification; that if *Stewart* does not control, any senior party in any interference would be permitted to add after-discovered "facts" via a motion to add counts to the recited common species of a described, generic invention where the activity of such added species is neither discovered nor described in such senior party's application in interference; that the board and Allgeier avoid addressing the real issue of this appeal—whether Allgeier has a right to make count 2, whereas, Hester raised the issue at the earliest opportunity; finally, that the "right to make" or "best mode" issue, however characterized, is ancillary to priority and, therefore, is appealable. Hester points out that he does not request priority on count 2; but, rather, the *dissolution* of the interference regarding count 2.

## OPINION

The ultimate issue is whether the board properly awarded priority on count 2 to Allgeier. However, the threshold issue, which has been variously characterized by the PTO and the parties, is whether species count 2 is patentably distinct from genus count 1. As seen from the portions of its opinion quoted above, the board avoided the threshold issue. However, somewhat anomalously, it also said:

A significant function of an interference proceeding is to insure that "only one patent should issue for one inventive concept." *Aelony v. Arni*, 547 F.2d 566, 192 USPQ 486 at 489 (CCPA 1977). Thus, in an interference between two applications, no two counts should be included which might result in a violation of this principle, i. e., a split award where two patents could issue to two different parties involving the same, or essentially the same, subject matter. *Becker v. Patrick*, 47 USPQ 314 (Comm'r. Pat. 1939). As is clear from Aelony, the test to apply is whether the counts are patentably distinct from each other.

In *Aelony, supra* at 569–70, 192 USPQ at 489–90, this court held that a particular threshold issue of "interference-in-fact" was ancillary to priority. The issue involved whether two sets of claims were patentably distinct. Citing *Nitz v. Ehrenreich*, 537 F.2d 539, 190 USPQ 413 (CCPA 1976), *Brailsford v. Lavet*, 50 CCPA 1367, 318 F.2d 942, 138 USPQ 28 (1963), and *McCabe v. Cramblet*, 20 CCPA 1220, 65 F.2d 459, 18 USPQ 71 (1933), the court declared "there is ample precedent from this court for framing the test of interference in fact in terms of whether two sets of claims are patentably distinct from each other. Thus, it appears that the threshold issue in *Aelony* and the threshold issue here, i. e., whether species count 2 is patentably distinct from genus count 1, are essentially the same. That a patentable distinctness issue is ancillary to priority if it arises in connection with an "interference-in-fact" question, but is not ancillary to priority if it arises in connection with adding a count would appear to be without justification and would simply elevate form over substance. As this court pointed out in *Aelony, supra*, 547 F.2d at 569, 192 USPQ at 489, which quoted from *Nitz v. Ehrenreich, supra*, 537 F.2d at 543, 190 USPQ at 416, the test of whether an issue is ancillary to priority is whether determination of that issue is so logically related to the issue of priority that an award of priority would depend on determi-

**522**

nation of that issue. That is true with respect to the threshold issue here. If the counts are patentably distinct, the issue of priority must be resolved by the board;[13] if they are not patentably distinct, count 2 is not properly in interference, and the issue of priority with respect to it is moot. Accordingly, we hold that the issue of whether species count 2 is patentably distinct from genus count 1, although arising from the addition of count 2, is ancillary to priority. To the extent that *Godfredsen v. Banner, supra*, conflicts with this holding, it is overruled.

Before the board's decision can be properly reviewed, it is necessary for evidence on the threshold issue to be more fully developed and for the board to render its opinion on that issue. Accordingly, the award of priority on count 2 is *vacated* and the case is *remanded* for further proceedings consistent with this opinion.[14]

*VACATED and REMANDED.*

BALDWIN, Judge, dissenting.

I do not agree with the majority that the issue of whether species count 2 is patentably distinct from genus count 1 is ancillary to priority, and must therefore be determined by the board. The purpose of an interference is to determine priority of invention between competing inventors. Patentability of the invention is not involved. The PTO has determined genus count 1 to be patentable over the prior art. That determination is not properly contested in the interference proceeding. Similarly, the PTO has determined that species count 2 is patentably distinct over genus count 1. That determination involves the same considerations of patentability as the determination of the patentability of count 1. In determining the logical relationship of an

issue to priority, I cannot distinguish the question of the patentable distinctness of count 2 from count 1 from the question of the patentability of count 1 over the prior art.

The majority extends the holdings of *Aelony v. Arni*, 547 F.2d 566, 192 USPQ 486 (CCPA 1977), and *Nitz v. Ehrenreich*, 537 F.2d 539, 190 USPQ 413 (CCPA 1976) to apply to a question of patentable distinctness *per se*. However, unlike the questions in *Aelony* and *Nitz*, there is no question of interference-in-fact before us. Species count 2 methanol is disclosed in example 13 of the Hester application and example 17 of the Allgeier application, thus providing support in the two specifications for the invention of count 2. Rather than remanding as the majority has done, I would agree with the board that the question of patentable distinctness is an issue involving amending counts which is not ancillary to priority and is not, therefore, properly reviewed by the board.

---

**13.** The question of patentability *per se* is not reached. *Nitz v. Ehrenreich, supra*, 537 F.2d at 544, 190 USPQ at 417. Nevertheless, the dissenting opinion "cannot distinguish the question of the patentable distinctness of count 2 from count 1 from the question of the patentability of count 1 over the prior art." However, the sole basis of patentable distinctness alleged by Allgeier is that species count 2 possesses unexpectedly superior properties compared to the properties of other compounds of genus

count 1; and the Deli-Stula declaration (filed by Allgeier) setting forth such properties was not executed until near the end of the motion period, long after both the filing date of the Allgeier Swiss application and the declaration of interference.

**14.** Because of our disposition of the case, it is unnecessary to reach the right-to-make or best-mode issue raised by Hester.